## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DON HENLEY,<br><br>　　　　　　　　Plaintiff,<br><br>　　　-against-<br><br>EDWARD KOSINSKI and CRAIG INCIARDI,<br><br>　　　　　　　　Defendants. | Civil Action No. 24 ____<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Don Henley, by and through his undersigned attorneys, for his complaint for a declaratory judgment against Defendants Edward Kosinski and Craig Inciardi, alleges upon knowledge as to his own actions and information and belief as to others' actions, as follows:

### NATURE OF THE ACTION

1. Plaintiff Don Henley seeks a declaratory judgment affirming his ownership over approximately 100 pages of his personal, handwritten lyric sheets that were seized by the New York County District Attorney ("DANY") during an investigation into how defendants Edward Kosinski and Craig Inciardi came to possess Henley's property.

2. Those lyric sheets, which remain in the possession of DANY, "must . . . be delivered to the owner, on satisfactory proof of his title . . . ." N.Y. Penal Law § 450.10(5). Because Kosinski and Inciardi have wrongly claimed ownership of Henley's lyric sheets, a declaration from this Court that Henley is the lawful owner is needed to supply "satisfactory proof of his title" and facilitate the DANY's return of Henley's lyric sheets to Henley.

3.    The lyric sheets in question document Henley's work in creating, developing, and
completing (together with Glenn Frey) the songs on the Eagles' classic 1976 album,
*Hotel California*. Henley stored his lyric sheets, handwritten across at least five legal
pads, in a converted barn on his farm in Los Angeles County, California, where he
thought they remained until he learned in March 2012 that four pages of his lyric sheets
for the song "Hotel California" were being auctioned on a website operated by defendant
Kosinski.

4.    When Henley's attorney contacted Kosinski to demand that the four pages be removed
from the auction and returned to Henley, Kosinski said their source was Ed Sanders,
whom the Eagles had retained in 1979 to write a book about the band. After Henley had
reviewed the book manuscript's June 1980 first draft, he gave Sanders access to his *Hotel
California* lyric sheets and other materials in his Los Angeles County barn in the hope
that Sanders would improve the draft by focusing on the band's songwriting. Sanders also
asked Henley's caretaker at the Los Angeles County farm to send boxes of Henley's
materials to Sanders's Woodstock, New York home. Under the Eagles' 1979 contract
with Sanders, all the materials to which Henley gave Sanders access and which were sent
to Sanders remained Henley's property.

5.    Sanders kept Henley's materials for decades despite knowing they were Henley's
property. When a New York book dealer, Glenn Horowitz, suggested in 2005 that
Sanders sell the five legal pads containing Henley's *Hotel California* lyric sheets,
Sanders at first declined, citing his reservations about how he obtained them. But he
relented in 2007 and sold Henley's five legal pads to Horowitz, who sold them to
Kosinski and a partner, defendant Inciardi, in 2012.

6.      Throughout his career, Kosinski has trafficked in music memorabilia of dubious provenance. Soon after acquiring Henley's lyric sheets, he and Inciardi began a nearly five-year campaign to profit from Henley's lyric sheets by selling or auctioning them off song by song, forcing Henley to intervene each time, including by notifying law enforcement.

7.      Kosinski and Inciardi kept their scheme a secret by concealing their identities as auction consignors and the extent of their holdings of Henley's property. In April 2012, for example, Kosinski concealed from Henley's attorney that he not only operated the website auctioning the four pages of Henley's "Hotel California" lyrics, but also had (together with Inciardi) consigned those pages to the auction and possessed 100 additional pages of Henley's lyric sheets for the entire album. Kosinski and Inciardi enlisted Horowitz as an intermediary to negotiate with Henley's attorney, thereby concealing their identities from Henley. Through Horowitz, Kosinski and Inciardi demanded a cash ransom from Henley to return the four pages of his "Hotel California" lyric sheets. Unaware that those four pages represented just the tip of the iceberg, Henley acquiesced.

8.      Kosinski and Inciardi repeated the pattern with other *Hotel California* lyric sheets on two more occasions in 2014 and 2016. Both times, they attempted, while concealing their identities, to ransom the pages back to Henley after Henley intervened to stop the auctions and demand his property's return. With Kosinski and Inciardi's pattern becoming clear, however, Henley refused to be extorted.

9.      Instead, Henley's representatives continued to notify law enforcement. After reporting theft twice to California authorities in 2012 and 2014, Henley's representatives contacted

New York authorities in November 2016 when Kosinski and Inciardi tried to auction 13 pages of Henley's "Hotel California" lyric sheets through Sotheby's in Manhattan.

10.     NYPD detectives subsequently seized, among other things, (i) the 13 pages of Henley's "Hotel California" lyric sheets from Sotheby's in December 2016; (ii) 84 pages of Henley's lyric sheets for songs from *Hotel California* from Kosinski's home in May 2019; and (iii) three pages of Henley's lyric sheets for another song from *Hotel California* from Sotheby's in October 2019.

11.     Henley now seeks the return of these lyric sheets from the DANY under New York law, which requires him to provide "satisfactory proof of his title." Because Kosinski and Inciardi have also claimed title over Henley's lyric sheets, the issue must be decided in a civil court with appropriate jurisdiction. Henley therefore seeks a declaration from this Court that he is the lawful owner of his seized lyric sheets to provide the "satisfactory proof of his title" that will facilitate the District Attorney's return of his property.

## THE PARTIES

12.     Plaintiff Don Henley is an individual residing in Texas and a founding member of the American band, the Eagles.

13.     Defendant Edward Kosinski is an individual residing in New Jersey. He claims to be the co-owner, along with defendant Craig Inciardi, of Henley's handwritten lyric sheets that are the subject of this action. Upon information and belief, Kosinski operates the music, sports, pop culture, and historical memorabilia auction house known variously as Gotta Have It! or GottaHaveRockandRoll.com ("GHRR").

14.     Defendant Craig Inciardi is an individual residing in New York. He claims to be the co-owner, along with defendant Kosinski, of Henley's handwritten lyric sheets that are the

4

subject of this action. Upon information and belief, he holds himself out as a curator of rock-and-roll history and memorabilia.

## JURISDICTION AND VENUE

15.   This Court has diversity subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between plaintiff Henley, a Texas citizen, and defendants Kosinski and Inciardi, citizens of New Jersey and New York, respectively, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16.   This Court has personal jurisdiction over defendant Kosinski because this action arises from transactions that occurred in New York, and Kosinski has personally availed himself of this jurisdiction. This Court has personal jurisdiction over defendant Inciardi because, on information and belief, he is domiciled in New York.

17.   Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because the property that is the subject matter of this action is located in this District and a substantial part of the events giving rise to Henley's claim occurred in this District.

## FACTS

**Henley Co-founds the Eagles and
Co-writes the Album *Hotel California***

18.   Henley is a founding member, with Glenn Frey and others, of the Eagles, one of the most successful American bands of all time. Since their formation in 1971, the Eagles have sold more than 200 million records worldwide, released five number-one singles and six number-one albums, and won six Grammy Awards and five American Music Awards. The band was inducted into the Rock & Roll Hall of Fame in 1998.

19.   Between 1972 and 1975, the Eagles released four studio albums featuring some of the most popular songs of the 1970s. Beginning with their second album, *Desperado*, in

1972, Henley and Frey became the band's primary songwriters. Their string of hits led to the early 1976 release of the Eagles' first compilation album, *Their Greatest Hits*. It became the highest-selling album of the 20th century in the U.S.

20.   While *Their Greatest Hits* was establishing the Eagles as one of the most successful American bands of the 1970s, Henley and Frey were writing what would become arguably their greatest success, the album *Hotel California*.

21.   Henley and Frey wrote the album together during 1975–76 from a house that they rented in Los Angeles, California, for the purpose of writing the album. They brought in furniture, a piano, and their guitars.

22.   Henley also bought legal pads on which he wrote lyrical ideas that he and Frey discussed over many hours and days, eventually refining them into final song lyrics. Their work product became the songs to *Hotel California*, the band's fifth studio album, released in December 1976.

23.   *Hotel California* became the third-highest-selling album in the U.S. of all time. Its first single, "New Kid in Town," and its third single, "Life in the Fast Lane," became two of the 1970s' most popular songs. But it was the album's second single and title track, "Hotel California," that became the Eagles' signature, topping the charts and winning the 1978 Grammy for Record of the Year.

24.   The writing of that and the album's other songs was documented on the legal pads that Henley brought to the rented house in Los Angeles. After the Eagles recorded the album, Henley stored the legal pads at his farm in Los Angeles County, California, which has a barn that Henley had converted into an apartment, office, and storage facility. He stored

the legal pads, along with other memorabilia such as gold and platinum record awards, in boxes in that converted barn. He did not keep an inventory of items stored in the barn.

**Henley's Handwritten Lyric Sheets for "Hotel California"**
**Appear on an Auction Website in March 2012**

25.  In March 2012, an employee of the Eagles' manager, Irving Azoff, learned from a friend that four pages of lyric sheets for the song "Hotel California" were available for sale on an auction website, GottaHaveRockandRoll.com. The lyric sheets were handwritten and taken from a yellow legal pad. Henley viewed the website and recognized his handwriting and lyric work. The minimum bid was $40,000.

26.  Henley contacted his attorney at the time, Jordan Bromley, and authorized him to have a private investigator report to police that his four pages of lyric sheets had been stolen. Bromley contacted GHRR, the operator of the auction website, and received a call back from the owner, defendant Kosinski, on March 28, 2012. Bromley told Kosinski that Kosinski had to remove the lyric sheets from his auction website because they were stolen. Bromley also asked for the identity of the consignor, or the person who had provided the lyric sheets to the auction house.

27.  Kosinski did not dispute Bromley's account, or specifically that the lyric sheets were Henley's property. He said the lyric sheets were sourced from a man named Ed Sanders, who Kosinski understood had worked with the Eagles in the 1980s. Kosinski said he would ask the consignor—who Kosinski concealed included Kosinski himself—for permission to remove the lyric sheets from the website.

**Ed Sanders Takes Henley's Handwritten Lyric Sheets**
**While Writing a Manuscript About the Eagles**

28.   Bromley informed Henley and Azoff that Kosinski had identified Sanders as the source
of the lyric sheets. Sanders, an acquaintance of Glenn Frey, had been hired by the Eagles
in 1979 at Frey's request to write a book about the band. Sanders had a reputation as one
of the early figures in the 1960s "counterculture" through his poetry, books (including
*The Family: The Story of Charles Manson*), and his band, the Fugs.

29.   In March 1979, Azoff (through the Eagles' literary agent, Sterling Lord) had executed on
the Eagles' behalf a contract with Sanders to prepare a "book-length manuscript" about
the band. Sanders agreed to write the manuscript, and the Eagles agreed to provide him
the material to write it:  "We agree to furnish you with all material relating to the subject
matter which we have reasonable access to and/or which we possess; and we shall use
our best efforts to help you gather material relevant to the Manuscript from other sources
(hereinafter collectively called the 'Material')."

30.   But the contract made clear that the manuscript and all "Material" belonged to the Eagles:
"In any event, the Manuscript prepared by you hereunder, as well as any and all Material,
shall be deemed to be our sole property." And in turn, under the Eagles' employment
agreement with Henley and the other members, Henley owned his songs and songwriting
materials.

31.   Sanders presented a first draft of the Manuscript, comprising around 100 pages, in June
1980. Henley did not believe the draft was acceptable for a variety of reasons, including a
lack of focus on the band's songwriting. In hopes of improving the quality of the
Manuscript and in keeping with the contract, Henley gave Sanders access to materials he
stored in his barn, including his legal pads.

32.     Sanders visited the barn on multiple occasions beginning in the summer of 1980. Upon

         information and belief, at Sanders's request, Henley's caretaker at the Los Angeles

         County property also sent boxes of Henley's material to Sanders's Woodstock, New

         York residence.

**Sanders Sells Henley's Lyric Sheets in 2007 to Glenn Horowitz,
Who Sells Them to Kosinski and Inciardi in 2012**

33.     Sanders kept Henley's material until 2007, when on information and belief he sold the

         first portion of it—five legal pads containing more than 100 pages of Henley's lyric

         sheets for the songs on *Hotel California*. That sale originated from an early 2005 visit

         that Sanders received at his Woodstock home from Glenn Horowitz, a book dealer who

         had come to view Sanders's personal archive.

34.     During that visit, Horowitz eyed the five legal pads containing Henley's handwritten lyric

         notes. When Horowitz proposed selling those pads as Sanders's agent, Sanders expressed

         misgivings. He explained that he had obtained the legal pads from Henley's Los Angeles

         County property, where he had access to Henley's storage. Sanders said that Henley's

         assistant had also mailed him files that Sanders had requested.

35.     Horowitz was undeterred. After shopping Henley's legal pads to prospective buyers,

         Horowitz persuaded Sanders in 2007 to sell them to Horowitz himself. Horowitz in turn

         sold Henley's legal pads in January 2012 to Craig Inciardi, a former curator at the Rock

         & Roll Hall of Fame, and his partner, Ed Kosinski, the owner of GHRR.

36.     Kosinski has a reputation in the music industry for turning a blind eye to provenance and

         title in pursuit of ill-gotten profits from unauthorized auctions of music memorabilia on

         GHRR. Consistent with that reputation, he and Inciardi devised a plan to cash in on

         Henley's handwritten lyric sheets by selling or auctioning them off piecemeal over time.

Two months after their purchase, in March 2012, Kosinski and Inciardi listed for sale the first excerpt from Henley's legal pads—four pages of Henley's handwritten lyric notes for the song "Hotel California." They appeared on GHRR's website, where they were discovered by Henley's representatives.

**Kosinski, Inciardi, Horowitz, and Sanders Fabricate Stories About the Provenance of Henley's Handwritten Lyric Sheets**

37.     Bromley's March 28, 2012 phone call started a race in Kosinski and Inciardi's camp to fabricate a story about how Sanders had come to possess Henley's five legal pads and had the right to sell them. Because Horowitz was the link between Sanders on the one hand and Kosinski and Inciardi on the other, Inciardi emailed Horowitz on March 30, 2012, with a draft statement for Sanders to send GHRR to vouch for the provenance of Henley's legal pads. Inciardi proposed that Sanders write, "I remember finding the material discarded in a dressing room backstage at an Eagles concert. I hope this is helpful to you. Sincerely, Ed Sanders." Horowitz quickly shot that story down, replying the same day, "He won't go for that."

38.     Later on March 30th, Horowitz suggested that Sanders say he received Henley's legal pads from someone who had since died—and therefore could not vouch for the chain of custody. In a March 30 email to Sanders and Inciardi, Horowitz asked, "Is the gentleman who gave them to you still amongst the quick? You have no reason to be concerned. You didn't purloin the pages and no one has ever claimed them. But if original giver of the documents is no longer alive chain begins and ends there."

39.     Sanders, Horowitz, and Inciardi cycled through several stories the next day, March 31, 2012. First, Sanders proposed a vague description of his source: "He worked in some capacity for the band. He was a stage assistant, I think. I received bountiful material from

many sources, and this guy was just one of many." Horowitz replied that he would craft
the story: "Let me do the work: easy enough to solve this. Gent in question functioned in
what capacity for the group? As I said, don't aggravate yourself; we'll bring this to a
quick conclusion." Horowitz next suggested to Sanders that the legal pads were "destined
for the scrap pile": "It's fair to say that, as if [sic] often the case, the papers in question
and the other stuff you accumulated were destined for the scrap pile?"

40.    At this point, Horowitz suggested that Inciardi reassure Sanders that he would not go to
prison for fabricating a story and participating in Inciardi and Kosinski's sale of Henley's
lyric sheets. Horowitz wrote to Inciardi on March 31, "It may be time for you to step in;
he's almost ready to have his 'explanation' shaped in to a communication." In a later
email to Inciardi that day, Horowitz wrote, "He merely needs gentle handling and
reassurance that he's not going to the can. You can see that between the lines I'm sure,
yes?" Inciardi responded that he "would like to speak with [Sanders] on the phone to put
him at ease."

41.    Inciardi and Sanders subsequently agreed that Sanders would not describe any specific
source to make their story harder to disprove. After they spoke by phone, Inciardi
emailed Sanders on April 2, 2012, with a draft statement for Sanders to send to Gotta
Have It:

> Pleasure speaking with you. Here is what we discussed:
>
> To: Gotta Have It Auctions
>
> Please be advised that I do in fact recognize the Eagles lyrics in your
> recent auction. They were given to me in the 1970's when I was writing a
> biography on the band. During this time, I was given a lot of material
> related to the Eagles from different people and I do not remember
> specifically who gave these items to me.

42.    Meanwhile, Kosinski sought to buy time with Bromley, Henley's attorney, through false
and misleading statements during two additional phone conversations on March 29, 2012.

43.    During the first call, Kosinski said that he would come back to Bromley within 24 hours
because the consignor was an estate. That statement was false because the consigner was
not an estate, but Kosinski and his partner, Inciardi.

44.    During the second call, Kosinski said that there were two additional buyers between
Sanders and the consignor, and that he was working or had worked his way to the first
buyer, who had documentation about purchasing Henley's legal pads from Sanders. That
statement was false because there was just one buyer, Horowitz, between Sanders and the
consignor. And it was misleading because Kosinski concealed that he and Inciardi were
in fact the second buyers and consignors.

**Kosinski and Inciardi Ransom the Lyric Sheets Back to Henley
After Henley's Attorney Demands Their Return**

45.    On April 2, 2012, Kosinski, Inciardi, and Sanders finally settled on their fabricated story.
Sanders sent Inciardi's draft statement to info@gottahaveit.com, where Kosinski received
it and forwarded it to Bromley the same day.

46.    In response, Bromley sent on April 10 a letter to Sanders and Kosinski (as the owner of
GHRR) in which he stated that Henley was "the lawful owner" of the "Hotel California"
lyric sheets that had appeared on the GHRR website. Bromley demanded that the
consignor (who, unbeknownst to Henley, were Kosinski and Inciardi) return the lyric
sheets to Henley and that Sanders return "any and all other material(s) that Mr. Sanders
removed from Mr. Henley's property."

47.    Kosinski responded the same day that his lawyer would contact Bromley. He never told
Bromley that he and Inciardi were in fact the consignors and had in fact purchased far

more than the four pages of Henley's "Hotel California" song lyric sheets that Kosinski
had put on GHRR's website. He never told Bromley that he and Inciardi had *five* of
Henley's legal pads totaling more than *100 pages* of Henley's lyric notes for the entire
*Hotel California* album.

48.     The next day, April 11, GHRR's counsel, Jeff Haas, emailed Bromley to schedule a call.
        Bromley called Haas and reiterated his letter's demand that Henley's lyric sheets be
        returned to Henley. Haas replied that he would speak with GHRR and respond.

49.     The same day, April 11, Henley's private investigator, Jon Perkins, reported to the Los
        Angeles County Sheriff's Department that some of Henley's handwritten lyric sheets for
        the song "Hotel California" had been stolen. After speaking to Bromley, the reporting
        officer wrote that the "chain of people" who had Henley's lyric sheets "led back to Ed
        Sanders," who told Kosinski that Henley gave him the lyric sheets while Sanders was
        writing a book about the Eagles. The reporting officer left Kosinski a message to call
        him, but Kosinski reportedly never returned the call. The officer recommended that the
        case be "active due to the possibility of recovering V/Henley's stolen property."

50.     The next day, April 12, Haas offered to put Bromley in touch with Horowitz, who Haas
        said purchased Henley's lyric sheets from Sanders and could "shed more light on the
        chain of custody." Communicating through Horowitz also allowed Kosinski and Inciardi
        to continue to conceal that they were the auction consignors and possessed an additional
        100 pages of Henley's lyric sheets—critical facts that Kosinski had labored to hide from
        Bromley through false statements and half-truths and that, if revealed, would threaten
        their entire plan to profit from the sale of Henley's property.

51.     Four days later, on April 16, 2012, Horowitz emailed Sanders that he was working on an "exit strategy": "Let me speak with Craig [Inciardi] today and hear his and his lawyer's thoughts on the wisest way to handle exit-strategy. Stay tuned: on the job."

52.     The "exit strategy" that Inciardi devised was to ransom Henley's lyric sheets back to him at a below-auction price that would avoid litigation. When Horowitz and Bromley spoke on April 18, Horowitz asked whether Henley would pay $10,000 for the return of the four pages of his "Hotel California" lyric sheets. Horowitz never told Bromley that Kosinski and Inciardi were the consignors, nor that he had in fact sold to them five legal pads totaling more than 100 pages of Henley's *Hotel California* lyric notes—far more than the four pages that he proposed to return to Henley for $10,000.

53.     To avoid litigation expense and expedite the return of the lyric sheets, Henley ultimately agreed to pay $8,500 for the return of the four pages of his "Hotel California" lyric sheets. Henley signed no agreements in connection with the transaction. GHRR created an April 25, 2012 invoice warranting that neither Sanders, Horowitz, nor "the consignors" (i.e., Kosinski and Inciardi) would claim title to the lyric sheets: "[A]ll right, title and interest to the lyric will be conveyed from the consignors to Mr. Henley, and consignors and auctioneer relinquish any claim to the 'Lyric.' . . . The consigners and auctioneer represent and warrant that Ed Sanders, Glenn Horowitz . . . and any third party deriving rights therefrom . . . shall not claim any proprietary interest (whether ownership or otherwise) in and to the 'Lyric' . . . ."

54.     Upon the return of his four pages of "Hotel California" lyric sheets, Henley believed the matter was resolved, because neither Kosinski nor Inciardi told Henley's representatives (either personally or through their intermediary, Horowitz) that they had approximately

100 additional pages of Henley's handwritten lyric sheets on the five legal pads that they had acquired from Horowitz.

**Kosinski and Inciardi List Additional Henley
Lyric Sheets for Auction in 2014**

55.    Kosinski and Inciardi laid low for nearly two years before their next attempt to cash in on Henley's handwritten lyric sheets. On February 26, 2014, Kosinski emailed Sotheby's auction house to propose consigning Henley's handwritten lyrics to the song "New Kid in Town" from *Hotel California*.

56.    In April 2014, Sotheby's questioned Kosinski about the lyric sheets. "[G]ive us the real story on the Eagles," a Sotheby's employee wrote. "What is the provenance documentation that goes with this?"

57.    On April 22, Kosinski responded with false and misleading statements. He wrote that he bought the lyric sheets "from someone who worked with Henley," which was false because he acquired them from Horowitz, not Sanders. Kosinski added that he "went through this with [Henley] recently and he ended up buying [the lyrics] from me," concealing that Horowitz had brokered the exchange at well below the auction price. Kosinski falsely stated that "Henley actually signed a receipt," so although he is "litigious," "he has no claim."

58.    In early May 2014, Kosinski and Inciardi decided to substitute the "New Kid in Town" lyric sheets with Henley's handwritten lyric sheets for another *Hotel California* hit, "Life in the Fast Lane." Kosinski delivered the three pages of "Life in the Fast Lane" lyrics to Sotheby's on May 7 and signed a consignment agreement on May 29, 2014.

59.     On June 22, 2014, two days before the auction for Henley's "Life in the Fast Lane" lyric sheets, Sotheby's asked Kosinski, "Who might claim the day before?" Kosinski replied, "Henley . . . we are covered with all."

60.     On June 24, 2014, Sotheby's offered the lyric sheets for sale. Shortly afterwards, Henley received an email from a publicist friend who worked in London. He notified Henley that he had seen lyric sheets for "Life in the Fast Lane" offered for sale while browsing a Sotheby's auction site.

61.     Henley contacted Bromley again. In response, Bromley tried unsuccessfully to reach a Sotheby's representative, Richard Austin, by phone, so he followed up with an email directing Sotheby's to remove the lyric sheets from the auction. Austin responded on June 25 that he had "contacted the seller to provide more details on the provenance." In another email the same day, Austin informed Bromley that Henley's lyric sheets had not sold in the auction and were no longer offered publicly for sale.

62.     Unable to sell Henley's "Life in the Fast Lane" lyric sheets at auction, Kosinski and Inciardi resorted to the same strategy they had used two years earlier—offering to return them to Henley for a cash ransom. This time, they concealed their identities from Bromley by communicating through Jeff Haas, the lawyer for GHRR. Haas emailed Bromley on June 27, 2014, that "[t]he individuals who consigned the 'Life in the Fast Lane' lyric to Sotheby's are friendly with GHRR and would be interested in selling the lyric to Mr. Henley through GHRR if Mr. Henley has interest. The transaction would be similar to the one GHRR brokered with respect to the 'Hotel Cali' lyric . . . . I understand that the lyric initially came from Ed Sanders and has a backstory similar to that of the 'Hotel Cali' lyric."

63.   Haas's false and misleading email perpetuated Kosinski and Inciardi's scheme. The
lyric's "backstory" was not just "similar," as Haas stated, but identical to that of the
"Hotel Cali" lyric. Nor did Haas say that the consignors were also the same; his assertion
that they were merely "friendly" with GHRR led away from Kosinski because Kosinski
was more than "friendly" with GHRR—he owned it.

64.   This time, Kosinski and Inciardi decided to raise the price. Haas wrote in his June 27,
2014 email that "the consignors" would return the lyric for $12,000. This time, Henley
refused to negotiate for the return of his own lyric sheets.

65.   On June 30, 2014, Henley's investigator, Jon Perkins, contacted the Los Angeles County
Sheriff's Department to file another theft report, this time for Henley's "Life in the Fast
Lane" lyric sheets. Referencing his 2012 report about Henley's "Hotel California" lyric
sheets, Perkins reported that "[i]t was determined that the lyric sheet was obtained by Ed
Sanders when he was doing research in order to write a book about the 'Eagles.' [Henley]
indicated that Ed Sanders was not given the lyric sheets and was not given permission to
take the lyric sheets from the storage location." The officer recommended that the case be
"active due to the possibility of locating the victim's property through the 'Sotheby's
Auction.'"

66.   Because of Henley's claim of ownership, Sotheby's did not return the three pages of
"Life in the Fast Lane" lyric sheets to the consignors, Kosinski and Inciardi.

**Kosinski and Inciardi Pursue Private Sales and Auctions**
**of Henley's Lyric Sheets in 2015 and 2016**

67.   Unable to sell the lyrics through a public auction or obtain a ransom from Henley,
Kosinski and Inciardi decided to change their strategy. Because Henley had quickly

learned of both public auctions at which they had tried to sell Henley's lyric sheets, Kosinski and Inciardi decided to seek a private sale.

68.    Between May and October 2015, Kosinski and Inciardi tried to negotiate through Sotheby's a private sale of 13 pages of Henley's "Hotel California" lyric sheets. Kosinski and Inciardi delivered the pages to Sotheby's in May 2015, but retrieved them in October 2015 when no sale materialized.

69.    Later in October 2015, Inciardi spoke to Christie's about arranging a private sale of the same 13 pages. Inciardi delivered the pages to Christie's on October 29, 2015, and Christie's prepared a draft contract under which Inciardi would receive no less than $700,000 from any sale.

70.    In preparing a brochure to solicit potential buyers, Christie's representative Tom Lecky asked Inciardi to explain the lyric sheets' provenance. Inciardi wrote on December 13, 2015, that the "[p]rovenance is Ed Sanders who worked on a book around 1980 about the Eagles that was never published. He worked closely with the band at the time." Inciardi falsely stated that an additional four pages of Henley's "Hotel California" lyric sheets were "sold by the dealer that I purchased it from." Inciardi concealed that the sale was far from ordinary course: the "dealer," Horowitz, had in fact brokered the return of those four pages to Henley after Henley had intervened to stop the auction.

71.    Inciardi's responses concerned Lecky, who convened a call with Inciardi and a Christie's attorney. Inciardi did not address Lecky's concerns on that call and provided no further details about the provenance of the 13 pages of Henley's "Hotel California" lyric sheets. Lecky believed that he lacked adequate provenance information to proceed with the sale. Christie's therefore returned the 13 pages to Inciardi on January 5, 2016.

72. Inciardi delivered them back to Sotheby's the same day to re-explore a private sale. Again, however, no sale materialized over the next seven months. On August 9, 2016, Kosinski signed a consignment agreement with Sotheby's to put the 13 pages of Henley's "Hotel California" lyric sheets up for auction in December 2016.

73. Henley's assistant discovered the auction listing on Sotheby's website in November 2016. Henley notified Azoff, whose office notified Bromley's law partner, Eric Custer, on November 30, 2016. The same day, Custer notified Sotheby's and Ed Sanders in a letter that Henley is "the lawful owner" of the 13 pages of his lyric sheets, and neither the consignor nor Sotheby's had the right to sell them. Custer demanded that the consignor return the 13 pages to Henley and again that Sanders return "any and all other material(s) that Mr. Sanders removed from Mr. Henley's property."

74. The next day, December 1, Kosinski angrily tried to strong-arm Sotheby's into continuing with the auction, writing in an email: "Regarding 'Hotel' Sotheby's knew there would be this problem to contend with. You really wanted the lyric for the auction knowing all the circumstances and told Craig and I 'Sothebys would defend any issues.' . . . [I]t is important Sothebys stands strong with [GHRR's attorney], no wavering."

75. Inciardi emailed another Sotheby's employee the next day, December 2, to complain: "As Ed discussed with you, I am a partner with him on the 'Hotel California' manuscript. Ed and I are very upset with the way things are being handled. We were assured . . . that Sotheby's was completely prepared to deal with any claims that might come about. We had wanted to sell the lyric as a private sale and [a Sotheby's representative] convinced us to put it in the auction. Now, Sotheby's legal department seems to be throwing us under the bus."

76.    Kosinski and Inciardi tried once again to strike a deal with Henley for the return of his

own lyric sheets. They proposed that Henley consent to the auction in exchange for 50%

of the auction proceeds, or alternatively that Henley pay them $90,000 to return the 13

pages. Once again, Henley refused to pay for the return of his own property.

**New York Authorities Seize Henley's Handwritten Lyric Sheets
During an Investigation into Their Provenance**

77.    Henley's representatives reported the November 2016 auction appearance of Henley's

handwritten lyric sheets to law enforcement authorities in Manhattan, who began an

investigation. On December 16, 2016, NYPD detectives seized from Sotheby's by search

warrant the 13 pages of Henley's "Hotel California" lyric sheets that Kosinski and

Inciardi had attempted to auction.

78.    When Horowitz learned that the New York County District Attorney's Office was

investigating the lyric sheets' provenance, Horowitz contacted Sanders in an effort to

frustrate the investigation. On February 22, 2017, he emailed Sanders that "the time has

come to identify the person who gave you tablet." Horowitz shamelessly suggested that

Sanders now identify Glenn Frey, who had died in 2016, as his source: "In an earlier

communication you once suggested Frey was the person from whom you got the

document. If Frey, he, alas, is dead and identifying him as the the [sic] source would

make this go away once and for all. Your thoughts, please?"

79.    After discussing the matter by phone with Horowitz between February 23 and 26, 2017,

Sanders questioned Horowitz's objective in a February 26 email: "Been pondering our

recent conversations. I'm not sure what the goal is . . . . So, the goal now is to transfer it

to Henley? Or to allow it to be auctioned at Sotheby's?"

80.    Horowitz responded on February 26 that the goal was to extricate him and Sanders from
the criminal investigation: "No. . . . [O]nce you identify GF as the source of the tablet
you and I are out of this picture for good. All [sic] want from you is a short note stating
that you received the lyric sheets and lots of other material for your book from Mr. Frey.
I can handle the rest."

81.    As Horowitz requested, Sanders drafted and sent to Horowitz on February 27 a statement
that he had obtained Henley's legal pads from Frey: "During 1979 I was researching and
writing a history of the band, the Eagles. I asked Glenn Frey, a long time friend, who had
brought me into the project, for some examples of songwriting. He supplied some lyric
sheets for some songs and voluminous other material on the history of the band."

82.    The problem was that none of this was true, and Horowitz had emails from Sanders
himself that contradicted it. On March 16, 2017, Horowitz forwarded and asked Sanders
to review an April 2005 email that Sanders had written to him, in which Sanders
described how he obtained the legal pads from Henley's Los Angeles County property
and questioned whether to sell them: "I was staying at Henley's place . . . , and had total
access to his boxes of stuff, and there was a lot, and I compiled a box of files I wanted
and his assistant mailed them to me. However, Henley . . . might conceivably be upset if
it gets out that these were sold. So, maybe we don't want to sell them at all?"

83.    To explain away that email, Horowitz suggested to Sanders that they fabricate another
layer to their story: "[The April 2005 email] contradicts what you sent me about Frey.
Were you protecting Frey while he was alive? I'm meeting with the DA tomorrow."
Horowitz wrote that Sanders needed to back him up if he were to tell that story to the

DA: "I have no problem if Frey's privacy from Henley's intrusiveness was behind this statement in 05 but want to make certain I'm on firm footing if I make that argument."

84. Sanders wrote back on March 16, 2017, "I was shielding Frey." Horowitz replied, "OK. On the job." The next day, Horowitz told prosecutors that Sanders claimed to have obtained Henley's legal pads from Glenn Frey and had not previously identified Frey as the source to protect Frey.

85. Continuing their investigation, New York authorities obtained warrants to conduct three additional searches between May and November 2019, during which they seized: (i) 84 pages of Henley's handwritten lyric sheets for songs from *Hotel California* from Kosinski's home on May 15, 2019; (ii) the three pages of Henley's handwritten lyric sheets for "Life in the Fast Lane" from Sotheby's on October 3, 2019; and (iii) boxes of Eagles-related material from Sanders's Woodstock, New York home on November 7, 2019.

86. A New York County grand jury indicted Kosinski, Inciardi, and Horowitz on charges including criminal possession of stolen property and conspiracy.

87. The trial began on February 21, 2024. During the trial, under pressure from defense counsel and the court, Henley waived attorney-client privilege over documents that had been withheld from discovery. Henley's representatives began to produce those documents on March 2, 2024. Although the prosecutor told the court that the documents strengthened the prosecution case, DANY agreed to dismiss the charges on March 6, 2024, based on the midtrial production of the privileged documents.

88. Henley's seized handwritten lyric sheets remain in the possession of DANY. N.Y. Penal Law § 450.10(5), which governs the disposition of property that is seized as stolen,

provides that the property "must . . . be delivered to the owner, on satisfactory proof of his title . . . ." A declaration from this Court that Henley is the lawful owner of his seized lyric sheets will be "satisfactory proof of his title" and thus facilitate their return. Because Kosinski and Inciardi have also claimed ownership of Henley's lyric sheets, the issue of title must be decided in a civil court with appropriate jurisdiction.

## CLAIM FOR RELIEF

### DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201, 2202
#### (Defendants Edward Kosinski and Craig Inciardi)

89.    Henley realleges and incorporates by reference each and every allegation contained in paragraphs 1–88.

90.    Henley is the rightful owner of the lyric sheets seized from Edward Kosinski and Sotheby's and has a right of possession superior to that of Kosinski and Inciardi.

91.    Kosinski and Inciardi do not have good title to the lyric sheets seized from Edward Kosinski and Sotheby's.

92.    Kosinski's and Inciardi's express claims of title to or the right to possess the lyric sheets creates an actual controversy with Henley over the ownership of the lyric sheets.

93.    Henley is entitled to a judgment under 28 U.S.C. §§ 2201 & 2202 declaring that all right, title, and interest in and to the lyric sheets seized from Edward Kosinski and Sotheby's is vested in Henley, and that neither Kosinski nor Inciardi has any right, title, or interest in and to those lyric sheets.

## JURY TRIAL DEMANDED

Henley hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Henley respectfully requests judgment in his favor and against Defendants Kosinski and Inciardi as follows:

(a)     A declaratory judgment that all right, title, and interest in and to the lyric sheets seized from Edward Kosinski and Sotheby's is vested in Henley, and that neither Kosinski nor Inciardi has any right, title, or interest in and to those lyric sheets;

(b)     Awarding such other and further relief as the Court deems just and equitable.


Dated:  New York, New York
          June 28, 2024

Respectfully submitted,

**O'MELVENY & MYERS LLP**

By: */s/ David N. Kelley*
David N. Kelley

David N. Kelley
B. Andrew Bednark
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
dkelley@omm.com
abednark@omm.com

Daniel M. Petrocelli (*pro hac vice forthcoming*)
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

*Attorneys for Plaintiff Don Henley*